[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11660
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 16, 2010
JOHN LEY
CLERK

D.C. Docket No. 0:09-cr-60245-WPD-7

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORGE HERRERA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 16, 2010)

Before HULL, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Jorge Herrera appeals his 27-month sentence for robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a).[1] He argues that the district court erred in denying his request for a minor-role reduction to his Sentencing Guidelines offense level. Upon review, we affirm.

I.

In 2009, the Broward County Sheriff's Office learned from a confidential informant ("CI") that two men, Amaury Hernandez and Lazaro Riveras, were the leaders of a violent group of individuals conducting home-invasion robberies and kidnapings. The CI set up a meeting with Hernandez and an undercover officer, who told Hernandez that he worked for the Drug Trafficking Organization ("DTO") and sought to rob 50 kilograms of cocaine from its stash house. Hernandez told the officer that his crew could conduct the robbery and collect the cocaine, and he agreed to give the officer ten kilograms of the cocaine. Hernandez described how they would tie up the stash house's guards when they entered the house, and added that they would tie up the officer, as well, in order to conceal his involvement in the scheme.

In subsequent meetings with the officer and the CI, Hernandez and Riveras

_____

[1] Herrera's consecutive, 60-month sentence for use or carrying of a firearm during and in relation to a drug trafficking crime and a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 2, is not under dispute.

expressed their willingness and ability to commit the robbery. Riveras stated that he and three other individuals would dress as police officers and assault the stash house. They planned to steal the cocaine and kidnap the guards in order to secure ransom money for their release. They added that, when the officer learned the address of the stash house, they would conduct reconnaissance using multiple cars.

On the day of the planned robbery, Riveras and two other men in a Chevrolet Impala followed the CI and Hernandez to a meeting with the officer at an undercover facility. A Ford F-350 and a Hummer H2 followed them partway to the facility, before diverting to a pharmacy. While Hernandez, the CI, and the officer met, law enforcement arrested the men in the Impala. Riveras had five 12-gauge shotgun shells on his person, and a search of the Impala revealed plastic ties for handcuffs, three hats, a pair of gloves, and a long-sleeved black shirt. In the meeting, Hernandez told the officer that guns for the robbery were in the Hummer. Hernandez was then arrested, as well.

The F-350 was stopped and its occupants, including Herrera, the driver, were arrested. A search of the F-350 revealed a Drug Enforcement Administration ("DEA") hat, packaging for two security-guard badges, a serrated 8.5-inch bladed knife, and the key to the Hummer. The Hummer was located at the pharmacy and was found to contain a 12-gauge shotgun, a loaded .380-caliber pistol, 2 security-

guard badges, a DEA hat, and a Federal Bureau of Investigation ("FBI") shirt. Hernandez had told the CI that he had real bullets, he intended to shoot and kill the stash house's guards if they resisted, and the CI should not worry because he and other members of the crew had conducted such robberies many times.

A federal grand jury indicted Herrera and his codefendants on multiple charges. Herrera pled guilty to Count 1, conspiracy to commit robbery by taking cocaine by force from an individual he believed to be engaged in narcotics trafficking, in violation of the Hobbs Act, and Count 5, use and carrying of a firearm during and in relation to a crime of violence and a drug trafficking crime.

As to Count 1, Herrera had a total offense level of 18 and a criminal history category of I, resulting in a guideline sentencing range of 27-33 months' imprisonment. At the sentencing hearing, Herrera argued for a minor-role adjustment. He stated that he was not involved in any of the meetings with the undercover officer or the CI, and he had been recruited only two or three days before by Riveras, his stepson. He was never armed and had pled to Count 5 only as an aider and abettor. He contended that his role was to drive the F-350 to the scene, enter the house after the occupants had been subdued, and help load the cocaine. He asserted that he had very limited exposure to the offense and had no authority to plan it, select the crew, or negotiate his payment.

4

The government responded that, according to Hernandez's testimony at a codefendant's trial, Herrera and two of the other co-conspirators were going to be the first ones to enter the stash house because they were of the largest physical stature. They would be followed by two armed individuals. All five men would be dressed in black, and Herrera and the other two unarmed men would be wearing the police gear. The armed men would aim their guns at the guards while the guards were bound with plastic ties. Only Hernandez and one other defendant would remain outside.

Herrera acknowledged that he had purchased and worn black clothes at Riveras's request. Nevertheless, counsel indicated his doubt that Herrera would have gone into the house to accost the guards, as he was 54 years old with severe physical infirmities.

The court stated that the defendant who remained outside with Hernandez might have had an argument for a minor role, but it did not see Herrera's role as minor. Herrera, like others, was going to go into the house, dressed in black, while some or all of them pretended to be law enforcement officers. All of the individuals who were going to enter the house played an integral part in the conspiracy. The court found that the fact that others may have played larger roles did not necessarily mean that Herrera had played a minor role. After hearing

argument as to the 18 U.S.C. § 3553(a) factors, the court sentenced Herrera to 27 months' imprisonment for Count 1 and 60 months' imprisonment for Count 5, to be served consecutively.

## II.

A district court must begin the sentencing process by correctly calculating the applicable guideline range. *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007). Likewise, we begin our review of a sentence for reasonableness by ensuring that the district court did not commit any significant procedural error, such as improperly calculating the guideline range. *Id.* at 51, 128 S.Ct. at 597. A district court's determination of the defendant's role in the offense is reviewed for clear error. *United States v. De Varon*, 175 F.3d 930, 937 (11th Cir. 1999). The party seeking the adjustment bears the burden of establishing its applicability by a preponderance of the evidence. *Id.* at 939.

"If the defendant was a minor participant in any criminal activity," his offense level is to be reduced by two levels. U.S.S.G. § 3B1.2(b). A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.5). In determining whether a minor-role adjustment applies, the district court should consider two principles: "first, the defendant's role in the relevant conduct for

6

which [he] has been held accountable at sentencing, and, second, [his] role as compared to that of other participants in [his] relevant conduct." *De Varon*, 175 F.3d at 940.

As to the first prong of the *De Varon* analysis, the court must assess the defendant's role in relation to all of the relevant conduct that was attributed to him under U.S.S.G. § 1B1.3, as the broad scope of that section may cause some defendants to be held accountable for conduct that is much broader than their specific acts. *De Varon*, 175 F.3d at 941. "Only if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in any larger criminal conspiracy—should the district court grant a downward adjustment for minor role in the offense." *Id.* at 944. As to the second prong of the analysis, the court should compare the defendant to the other participants only to the extent that the others (1) "are identifiable or discernable from the evidence," and (2) "were involved in the relevant conduct attributed to the defendant." *Id.* Relative culpability might not be dispositive, since it is possible that none of the participants had minor or minimal roles. *Id.* Thus, the defendant must show that he "was less culpable than *most other participants* in [his] relevant conduct." *Id.*

Here, Herrera was held accountable only for his own conduct, not for any

7

additional conduct that was broadly relevant under § 1B1.3. The court found that Herrera, like four of the other six participants, purchased black clothing to wear as he entered the stash house, and he drove one of the vehicles to the stash house. His role in the planned robbery was to enter the house as one of the five individuals pretending to be law enforcement officers, and to help with removing the cocaine from the house. The two remaining conspirators were to remain outside the stash house while Herrera and the others conducted the raid. Counsel's argument that Herrera's physical infirmities made him unlikely to personally kidnap or subdue the guards did not, by itself, establish that he played a minor part in the scheme or that he was less culpable of the robbery than most of the other participants. *See De Varon*, 175 F.3d at 944. Therefore, the district court's denial of the minor-role reduction was not clearly erroneous. *See id.* at 937.

For the foregoing reasons, we affirm Herrera's sentence.

**AFFIRMED.**